AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>2327 PENN AVE. SE, ALBUQUERQUE, NM 87106. | )<br>)<br>)<br>)<br>)<br>) |

Case No. MR 23-1467

**AMENDED**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference).

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing and manufacturing of firearms without a license |
| 18 U.S.C. § 933 | Trafficking in firearms |

The application is based on these facts:

Please see the attached affidavit of ATF Special Agent Allison Garcia, which is incorporated by reference and has been reviewed by AUSA Lou Mattei.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Allison Garcia, ATF Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephonically sworn and electronically signed___ *(specify reliable electronic means).*

Date:  ___8/4/2023___

_____
*Judge's signature*

City and state:  ___Albuquerque, New Mexico___

Honorable B. Paul Briones, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

2327 PENN AVE. SE, ALBUQUERQUE, NM 87106.

Case No. _____

### *AMENDED[1]* **AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Allison Garcia, being first duly sworn, hereby depose and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 2327 Penn Ave. SE, Albuquerque, NM 87106 (the "PREMISES"), further described in Attachment A, for the things described in Attachment B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been since January 2021.

3. I have been involved in an ongoing investigation regarding the distribution and recovery of firearms in Albuquerque, New Mexico, and the Republic of Mexico that were originally purchased by Anthony LUTZ.

4. I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents

---

[1] This affidavit was amended on August 4, 2023, to include information learned during the execution of the search warrant as originally written to support an Amended Attachment B.  The newly added text appears in ***bold italics*** below.

and support staff who have participated in the investigation.  In addition, I have developed information I believe to be reliable from sources:

    a.    Information provided by Special Agents ("SA") and Intelligence Research Specialists (IRS) of the ATF and other Federal agencies;

    b.    Review of ATF Forms 4473 containing firearm purchase information;

    c.    Information derived from a recorded interview;

    d.    Information derived from police reports.

5.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6.    I believe there is probable cause that LUTZ has committed, is committing, and will continue to commit offenses involving violations of the following statutes, and that evidence of these violations is likely to be found in the places to be searched:

    a.    18 U.S.C. § 922(a)(1)(A) – Dealing and manufacturing of firearms without a license; and

    b.    18 U.S.C. § 933 – Trafficking in firearms.[2]

## EVIDENCE SOUGHT DURING SEARCH

7.    Based on my training, experience, and participation in this and in similar investigations, I know that individuals involved in illegal firearms trafficking and unlicensed dealing and manufacturing of firearms often conceal evidence of their criminal activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to

---

[2] This section of Title 18 has been effective since June 25, 2022.  Some of the conduct described below predates the enactment of this statute.

which they have ready access such as garages, carports and outbuildings.  They also conceal

evidence in vehicles, including vehicles outside of their residences (including vehicles parked on

the street when no driveway exists) and businesses, so that they have ready access to it and so

that they can hide it from law enforcement, including law enforcement officers executing search

warrants at their residences or businesses.  Evidence also may be found in other areas to which

the individual has ready access, such as rented storage areas and safety deposit boxes, or buried

underground on their property.  This evidence, which is discussed in detail in the following

paragraphs, includes digital media, such as cell phones, computers, flash drives, or discs, plastic

(filament) materials, 3D printers and associated components and storage media, tools for sanding

and shaping firearms and firearms parts, as well as proceeds from sales and valuables obtained

from those proceeds and documents related to those sales and proceeds.

8.      Other evidence of transportation, ordering, possession, and sale of firearms or

materials to manufacture firearms can include the following: telephone bills to show numbers

called by the trafficker or dealer (and potential associates), overnight mail receipts, bank

statements, deposit and withdrawal slips, savings books, investment statements, loan statements,

and other financial institution statements.  The above items are often stored on a suspect's

person, in their business or residence, in their vehicles, in surrounding garages, outbuildings,

carports and yards, and the residences of friends or relatives.  This type of documentation can be

stored on digital media and concealed virtually anywhere.

9.      The use of digital media, including smartphones, tablets, cellular phones, and

digital devices, has become part of everyday life.  This is also true for firearm traffickers and

those who deal firearms without a license.  Information stored in electronic form on all of the

above devices can provide evidence of trafficking and illegal firearms dealing.  Firearm

3

traffickers and unlicensed dealers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the firearm trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services.  Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications.  The content of these communications will often provide evidence of firearm trafficking and unlicensed dealing.  Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the person has called or otherwise communicated with, thus identifying potential criminal associates.

10.     Firearm traffickers and unlicensed dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their firearms or firearm parts, typically for the purpose of advertising these goods for sale to others.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium.  Firearm traffickers and unlicensed dealers frequently use these devices to take their photographs and videos.

11.     They also may maintain indicia of firearms possession, such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and

instruction manuals and other documentation for firearms and ammunition.

12.     Firearm traffickers and unlicensed dealers often utilize digital video surveillance systems.  A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system.  Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that traffickers and unlicensed dealers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the person's proceeds.  Firearm traffickers and unlicensed dealers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity.  However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' trafficking activities and conversations related to trafficking or unlicensed dealing.

13.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises or in the vehicle, including contraband and other evidence seized.  Documents and items showing the identity of the person(s) owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be stored on digital media such as cell phones and computers, downloaded from online accounts, or scanned into digital format and stored on computers and related digital media.

14.     The term "computer" includes all types of electronic, magnetic, optical,

electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.  The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.  Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

15.    A list of items I seek authority to seize is in Attachment B.

## ELECTRONIC MEDIA AND FORENSIC ANALYSIS

16.    As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium.  Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

17.    *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises or other location for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant.  In lieu of removing electronic media from the premises, it is sometimes

possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  *The time required for an examination*.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Electronic media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  *Technical requirements*.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES.  However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

18.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

19.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners and facial recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's camera then analyzes, and records data based on the user's facial characteristics.  The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is

9

particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a

10

user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

11

## PROBABLE CAUSE

### I.    LUTZ's Firearms Purchase History

20.    In April 2023, I initiated an investigation into Anthony LUTZ after I received notification that a firearm LUTZ purchased in Albuquerque, New Mexico, had been recovered from a crime scene in the city of Fresnillo, in the state of Zacatecas, in the Republic of Mexico. The firearm was recovered by Mexican law enforcement officials on October 11, 2022.  It was an Anderson Manufacturing AM-15 556 caliber rifle, bearing serial number 19218177.  ATF Form 4473 records show that LUTZ purchased this firearm from Omni Arms, at 11215 Central Ave. NE, Albuquerque, NM 87123, on or about October 24, 2019.

21.    I then began investigating LUTZ's firearms purchase history.  Between 2019 and July 2023, LUTZ purchased approximately 76 firearms from stores throughout Albuquerque, New Mexico.  The majority of those purchases (approximately 62) were receivers,[3,4] which I know, based on my training and experience, can be subsequently built out into fully functional firearms.  During an interview in July 2023 (discussed more below), LUTZ admitted to ATF agents that he previously purchased receivers and built them out into fully functional firearms, which he sold to others.  The remaining firearms in LUTZ's purchase history were either fully assembled firearms at the time of purchase or silencers, which are National Firearms Act (NFA)

---

[3] A "receiver" is "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure."  27 C.F.R. § 478.12(a)(2).  This regulation also provides diagrams depicting examples of receivers.

[4] Federal law includes receivers within the definition of "firearm."  *See* 18 U.S.C. § 921(a)(3); 27 C.F.R. § 478.11.

classified firearms, meaning they must be registered in the National Firearms Registration and Transfer Record.

22.     Based on my training, knowledge, and experience, LUTZ's firearm purchase history—approximately 62 receivers and 14 fully assembled firearms or silencers—demonstrates a high volume of purchases of firearms with similar or identical makes and models and is consistent with the purchase history of someone who is reselling or otherwise further distributing these weapons to others.

23.     I also conducted research into whether any firearms purchased by LUTZ (other than the one recovered in Fresnillo, Mexico, discussed above) had been recovered from crime scenes.  When a firearm is recovered in connection with a presumed crime, it is often submitted for tracing by law enforcement and subsequently traced by the ATF National Tracing Center (NTC) to determine the original purchaser of the firearm.  The NTC locates information such as the type of firearm, the date of purchase, the purchaser, and the Federal Firearms Licensee (FFL) who sold the firearm.  The NTC also provides metrics for "time-to-crime"—meaning the number of days between the purchase of the firearm and its recovery at a crime scene.

24.     Between 2019 and 2023, nine firearms (in addition to the one described above) that LUTZ purchased in Albuquerque were later recovered from crime scenes and subsequently traced by law enforcement.  Five of those weapons were recovered from crime scenes in New Mexico, and four were recovered from crime scenes in the Republic of Mexico.  The specific firearms that were recovered and traced are:

   a.  Sig Sauer P365 9mm caliber pistol, serial number 66B892493; purchased by LUTZ on November 30, 2021, from Sportsman's Warehouse, 1450 Renaissance Blvd. NE Albuquerque, NM 87107.  The firearm was recovered on March 24, 2022, from Tiana Lozoya at 2321 Central Ave. NW Albuquerque, NM 87104, with a time-to-crime of 114 days.

13

b. Spikes Tactical ST15 556 caliber pistol, serial number DTOM07542; purchased by LUTZ on July 13, 2020, from Omni Arms, 11215 Central Ave. NE Albuquerque, NM 87123.  The firearm was recovered on September 30, 2021, from Terrance Lynch at 353 Grove St. SE, Albuquerque, NM, 87108, with a time-to-crime of 444 days.

c. Palmetto State Armory PA-15 223 caliber rifle, serial number SCD075836; purchased by LUTZ on May 18, 2020, from New Mexico Weapons, 916 Benjamin Ct. SE, Rio Rancho, NM 87124.  The firearm was recovered on January 18, 2022, from Gabriel Guevara, in Albuquerque, NM, with a time-to-crime of 610 days.

d. Anderson Manufacturing AM-15 556 caliber rifle, serial number 19218168; purchased by LUTZ on September 21, 2019, from Omni Arms, 11215 Central Ave. NE Albuquerque, NM 87123.  The firearm was recovered on January 16, 2021, in the Republic of Mexico, with a time-to-crime of 483 days.

e. Spike's Tactical LLC ST15 223 caliber rifle, serial number NSL158793; purchased by LUTZ on November 13, 2019, from Omni Arms, 11215 Central Ave. NE, Albuquerque, NM 87123.  The firearm was recovered on December 22, 2021, in the Republic of Mexico, with a time-to-crime of 770 days.

f. Anderson Manufacturing AM-15 multi-caliber rifle, serial number 19218173; purchased by LUTZ on November 29, 2019, from Omni Arms, 11215 Central Ave. NE, Albuquerque, NM 87123.  The firearm was recovered on November 4, 2020, from Macario Torres in the Republic of Mexico, with a time-to-crime of 341 days.

g. Anderson Manufacturing AM-15 multi-caliber rifle, serial number 19218179; purchased by LUTZ on September 28, 2019, from Omni Arms, 11215 Central Ave. NE, Albuquerque, NM 87123.  The firearm was recovered on August 25, 2021, in the Republic of Mexico, with a time-to-crime of 697 days.

h. Palmetto State Armory M4A1 Carbine 556 caliber rifle, serial number W014009; purchased by LUTZ on May 18, 2020, from New Mexico Weapons, 916 Benjamin Ct. SE, Albuquerque, NM.  The firearm was recovered at 9015 London Ave. SW, Albuquerque, NM 87121 on July 14, 2023, with a time-to-crime of 1152 days.

i. Anderson Manufacturing 556 caliber rifle (no model listed), serial number 19339637; purchased by LUTZ on March 19, 2020, from Omni Arms, 11215 Central Ave. NE, Albuquerque, NM 87123.  The firearm was recovered at 2800 Parsifal St. NE, Albuquerque, NM 87112 on May 5, 2023, with a time-to-crime of 1142 days.

25.    Based on my training, knowledge, and experience, I know that this is a high volume of traces of guns recovered from crime scenes linked back to an individual purchaser. According to ATF records, between 2019 and 2023, LUTZ has never held a license to manufacture or deal firearms.  I therefore believe this pattern—10 firearms that LUTZ purchased subsequently being recovered from crimes scenes in New Mexico and the Republic of Mexico— is consistent with LUTZ engaging in firearms trafficking, in violation of 18 U.S.C. § 933, and dealing and manufacturing firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A).

26.    Most of the recovered firearms described above also have a relatively short "time-to-crime"—meaning the number of days from LUTZ's purchase of the firearm until its recovery at a crime scene.  Based on my training and experience, I believe a "time-to-crime" of three years or less is consistent with firearms trafficking or unlicensed dealing because legitimate firearms owners typically keep their weapons permanently or for periods of time that are substantially longer than three years.  Therefore, I believe a short time-to-crime metric across multiple weapons purchased by the same individual—as illustrated by the pattern of firearms purchased by LUTZ and later recovered from crime scenes—is consistent with unlicensed firearms dealing and firearms trafficking.

**II.    Interview with LUTZ in July 2023**

27.    On July 13, 2023, ATF agents traveled to the PREMISES to conduct a consensual encounter with LUTZ related to his July 12, 2023, purchase of an Aero Precision LLC/VG6 M4E1 multi-caliber receiver, with serial number M4-0532852, and a Shadow Systems CR920P 9mm pistol, with serial number S032235.  These firearms were similar in make and model to the previously mentioned firearms that were recovered from crime scenes.

28.     ATF SA Amber Pace and I spoke with LUTZ on the front porch of his residence.

LUTZ remained on the porch near the front door of his residence for the entirety of the

interview.  Even though LUTZ was not in custody and was free to refuse to speak with agents,

agents administered *Miranda* warnings to LUTZ.  He agreed to speak with agents.

29.     LUTZ admitted that he personally built receivers into functioning firearms before

he sold them to others.  LUTZ claimed that he was a firearms "enthusiast" and stated that he

would take firearms to the range to figure out what he liked about one firearm as compared to

other firearms.  LUTZ claimed that he had been trading firearms throughout his entire adult life.

30.     LUTZ admitted that he would sell multiple firearms at once, usually to different

purchasers.  LUTZ claimed that his timeframe to sell firearms depended on how long it took him

to make them the way he liked them, and he would try them out with different parts.  LUTZ

claimed that the shortest timeframe where he would purchase a firearm and then sell it could be

"a couple of days" and he put a lot of money into buying his next gun to "try it out."  Based on

my training and experience, purchasing and then reselling a firearm within "a couple of days" is

consistent with firearms trafficking or unlicensed dealing.  LUTZ admitted that he would

typically purchase receivers for around $100.  Based on my training and experience, once such a

receiver is fashioned into a fully functioning firearm, its resale value would likely be much

greater than $100.

31.     LUTZ admitted that he arranged to sell and trade firearms through the website

www.jasonsguns.com.  Based on my training and experience, I know that this website is an

online platform that is commonly used to facilitate firearms sales.

32.     Regarding his manufacturing of firearms, LUTZ claimed that he only had basic

tools, like a hammer, to build the firearms and it "did not take much."  Based on my training,

knowledge, and experience, the process of building firearms would require more tools and machinery than only a hammer.

### III.    Identification of the PREMISES and LUTZ's Truck

33.    On July 13, 2023, in connection with the interview described above, I observed LUTZ at the PREMISES.  LUTZ exited the residence to speak with agents.  LUTZ presented a driver's license that confirmed his identity.

34.    On three occasions in July and August 2023, agents have observed a 2004 gray Ford F-150 bearing New Mexico license plate BHWG00 parked on the street in front of the PREMISES, but not within the curtilage of the PREMISES.  The vehicle is registered to Anthony LUTZ at the PREMISES.  Therefore, there is probable cause to believe this is LUTZ's vehicle and that the evidence described above and in Attachment B will be located in this vehicle, as well as in the PREMISES.

### IV.    *Execution of Search Warrant on August 4, 2023*

*35.    **On August 4, 2023, during the execution of this warrant as originally written, agents encountered in plain view inside the PREMISES several documents, books, papers, paraphernalia, and other records that I believe, based on my training and experience, and that of other agents and officers involved in this investigation, are consistent with LUTZ or other residents of the PREMISES being involved with white supremacist or anti-government groups.  For example, agents encountered documents, records, and books indicating support for genocide, Naziism, white supremacy, and overthrow of the government. Additionally, agents observed records appearing to describe how to assemble explosive devices and "booby traps," as well as numerous manuals and records which appeared to describe military and survival tactics.  Other documents appeared to provide instructions on how to potentially***

*justify homicide as a civilian.  Some of these documents were contained in a safe that LUTZ provided the combination for, and which the other adult resident of the PREMISES denied having access to.*

*36.     Based on my training and experience, and that of other agents and officers involved in this investigation, I know that those involved in firearms trafficking and unlicensed firearms dealing may be involved or associated with criminal organizations, such as drug-trafficking organizations, motorcycle clubs, white supremacist groups, anarchist or anti-government groups, and domestic and foreign terrorist groups.  This is true because such organizations may seek to acquire firearms and other weapons outside of legal channels so that there is no record or "paper trail" of the firearms being acquired.  In addition, members of such criminal organizations may be prohibited from legally purchasing or possessing firearms due to prior felony convictions or involvement in illegal activities, so their only means of obtaining firearms may be to purchase them from illegal traffickers or unlicensed dealers.*

## CONCLUSION

37.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

[Signatures on next page]

Respectfully submitted,

Allison Garcia
Special Agent
ATF

Electronically signed and telephonically sworn on
August __4__, 2023.

Honorable B. Paul Briones
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

The property to be searched is 2327 Penn Ave. SE, Albuquerque, NM 87106, hereinafter the "PREMISES," further described as a brown stucco house with dark brown wood pillars and a blue front door.  The numbers "2327" are affixed in gold to the stucco on the front of the house near the front door.  A photograph of the PREMISES is included below:



The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, all persons located on the PREMISES in or on which the items to be seized could be concealed, and all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or to Anthony LUTZ.  The search shall specifically

include the person of LUTZ and the vehicle described below, if they are present at the PREMISES at the time of the search.

*Person to be searched: Anthony LUTZ*

Anthony LUTZ is a white male with brown eyes, approximately 5'8" and approximately 200 pounds.  A photograph of LUTZ is included below:



*Vehicle to be searched*

The search of the above PREMISES shall include a 2004 gray Ford F-150 bearing New Mexico license plate BHWG00.  The vehicle is registered to Anthony LUTZ at the PREMISES. Based on surveillance, it appears LUTZ commonly parks this vehicle on the street in front of the PREMISES, but not within the curtilage of the PREMISES.  However, there is probable cause to believe it is LUTZ's vehicle based on the registration information noted above and the fact of it being parked in front of the PREMISES, where LUTZ resides.

# AMENDED[1] ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 18 U.S.C. § 933, that being trafficking in firearms, and 18 U.S.C. § 922(a)(1)(A), that being dealing and manufacturing of firearms without a license, involving Anthony LUTZ, including:

1. Firearms and ammunition, including but not limited to handguns, rifles, shotguns, receivers, and automatic weapons.

2. Firearms components, parts, and tools that may be used to manufacture firearms.

3. Large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of transactions.

4. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

5. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their trafficking associates.

6. Messages, notes, correspondence, and/or communications between trafficking associates.

7. Indications of ownership or residency of the PREMISES and/or other premises used in unlawful trafficking or unlicensed dealing activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

---

[1] This Attachment was amended on August 4, 2023, to include information learned during the execution of the search warrant as originally written.  The newly added text appears in ***bold italics*** below.

8. Indications of ownership or use over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

9. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

10. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the traffickers themselves.

11. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of firearms or firearm parts and accessories.

12. Digital video surveillance systems, including the associated storage media.

13. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

14. ***Books, records, receipts, diaries, notes, ledgers, and other papers, insignia, or paraphernalia relating to membership in or support of any criminal organizations, such as white supremacist groups, motorcycle clubs, and anti-government groups.***

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form

(such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a

user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the PREMISES in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.